## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) Bankruptcy Case No. 06-16403 EEB |
| | ) Chapter 11 |
| CENTRIX FINANCIAL, LLC, *et al.,* | ) |
| | ) |
| Debtors, | ) **Jointly Administered** |
| | ) |
| | ) |
| CENTRIX FINANCIAL LIQUIDATING TRUST | ) |
| and JEFFREY A. WEINMAN IN HIS CAPACITY | ) |
| AS TRUSTEE FOR THE CENTRIX FINANCIAL | ) |
| LIQUIDATING TRUST, | ) |
| | ) |
| | ) Adversary Proceeding No. _____ |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| ROBERT E. SUTTON, 6762 POTOMAC, LLC, | ) |
| CENTRIX CONSOLIDATED, LLC, CENTRIX | ) |
| FUNDS, LLC, FOUNDERS INSURANCE | ) |
| COMPANY LTD., JOHNSON STREET | ) |
| HOLDINGS, LLC, PHOENIX CAPITAL | ) |
| MANAGEMENT, RES CAPITAL HOLDINGS, | ) |
| INC., WILLISTON HOLDINGS, LTD., GRAND | ) |
| CONSTRUCTION, LLC, HARRISON CUSTOM | ) |
| BUILDERS, LTD., DESIGN MANAGEMENT, | ) |
| INC., LYNDON PROPERTY INSURANCE | ) |
| COMPANY, GERALD FITZGERALD, HOWARD | ) |
| KLEMMER, JOHN SCHREVEN, ROLAND | ) |
| ANDERSON, KATHERINE SUTTON, JULIE | ) |
| SUTTON, ELIZABETH SUTTON, DAVID | ) |
| SUTTON, BIRDIE, LLC and JOHN DOES 1-50 | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiffs Centrix Financial Liquidating Trust and Jeffrey A. Weinman in his capacity as

the Trustee for the Centrix Financial Liquidating Trust (collectively, "Plaintiff" or the "Trust"),

through its attorneys, Foley & Lardner LLP, for its Complaint against Defendants Robert E.

Sutton ("Sutton"), 6762 Potomac, LLC, Centrix Consolidated, LLC, Centrix Funds, LLC,

Founders Insurance Company Ltd., Johnson Street Holdings, LLC, Phoenix Capital

Management, RES Capital Holdings, Inc., Williston Holdings, Ltd., Grand Construction, LLC,

Harrison Custom Builders, Ltd., Design Management, Inc., Lyndon Property Insurance

Company, Gerald Fitzgerald, Howard Klemmer, John Schreven, Roland Anderson,  Katherine

Sutton, Julie Sutton, Elizabeth Sutton, David Sutton, Birdie, LLC and John Does 1-50

(collectively the "Defendants"), states as follows:

## I.      NATURE OF THE CASE

1.      Plaintiff Trust is the successor-in-interest to the Debtors and has the right to

pursue all causes of action on their behalf.  Defendant Sutton controlled the Debtors and was for

each of the Debtors either an executive officer, director, principal shareholder and/or principal

decision-maker.  In this lawsuit, the Trust sues Sutton and other insiders and entities in league

with him for perpetrating various schemes and engaging in other misconduct that effectively

bankrupted the Debtors by causing them to lose more than $100 million.

2.      Debtors had been in the business of originating and servicing subprime auto

loans.  Debtors recruited a series of credit unions to fund these loans.  To induce the credit

unions to provide funds, Sutton devised a program, described more fully below as the "Portfolio

Management Program" ("PMP"), under which the credit unions, in theory, would be protected

against the risk of loss on their financing of the auto loans by two insurance products: (1)

"Default Protection Insurance" (also known as "DPI"), which would pay if the borrower

defaulted on his loan and the automobile could be recovered and (2) "Vendor Single Insurance"

(also known as "VSI"), which would pay if no automobile was recovered after such a default.

3.      Sutton manipulated this business to serve his private interests and those of his

family and cronies.  His wrongdoing falls into several distinct categories.  First, Sutton caused

the Debtors to make a series of fraudulent transfers to him on his behalf or to his family and/or

2

cronies and otherwise dominated the Debtors and used the Debtors as his own fiefdom, causing

Debtors to act for his own benefit and to the extreme detriment of the creditors, including the

credit unions and equipment leasing companies (the "Fraudulent Transfers") (see General

Allegations, Part B).  Such transfers included payments by certain of the Debtors for Sutton's

personal expenses, including his private jet; gifts from Tiffany's and Walt Disney products;

millions for his personal taxes; payments for construction and improvements on Sutton's

personal home and the diversion of tens of millions of dollars from Debtors to Sutton's relatives

who are some of the other Defendants here, to other Sutton-controlled entities such as 6762

Potomac, LLC, Johnson Street Holdings, LLC and Birdie, LLC, and to Sutton cronies, all of

which financially benefited Sutton and the other Defendants at Debtors' expense and served no

legitimate business purpose.

4.      Second, Sutton and other insiders perpetrated a scheme whereby he caused one of

the Debtors, Centrix Financial LLC, to assume the actual risk of default on auto loans by

reimbursing insurance companies and directly paying credit unions on claims (the "Reinsurance

Scheme") (see General Allegations, Part A(ii)).  Centrix Financial LLC and its creditors suffered

huge costs and losses without receiving adequate consideration in return, while Sutton (either

directly or through entities which he controlled such as Defendants Centrix Consolidated, LLC

and/or RES Capital Holdings, Inc.) reaped the benefits of his scheme.  Sutton thus personally

shared in the profits, while arranging for Centrix Financial to bear the cost associated with

insurance claims.  Defendants Founders, Williston Holdings, Ltd. and Centrix Consolidated LLC

knew or should have known that obligations that rightfully should have been borne by Founders

were instead palmed off on Debtor Centrix Financial, giving Founders an improper free ride.

These Defendants, too, helped enable the Reinsurance Scheme.

5.     Third, while controlling Debtor Centrix Financial, Sutton and other insiders, in violation of fiduciary obligations, caused Centrix Financial to act to its detriment by agreeing to make tens of millions of dollars in voluntary payments on behalf of various credit unions, DPI providers and VSI providers, where Centrix Financial had no contractual obligation or legitimate business reason to do this.  These payments prolonged and helped conceal and cover up Sutton's wrongdoing that benefited Sutton and caused the Debtors to suffer financial ruin (the "Voluntary Payment Scheme") (see General Allegations, Part C).

6.     Sutton and other insiders also breached their duties to Debtor Centrix Financial and other Debtors by causing Centrix Financial to transfer away valuable assets in forming and operating Defendant Centrix Funds, LLC (the "Centrix Funds Formation Scheme") (see General Allegations, Part D).  This served no legitimate purpose.  Opportunities were shifted to Centrix Funds, LLC while losses were borne by Debtor Centrix Financial, all to Debtors' extreme detriment.  Sutton later transferred ownership of Centrix Funds, LLC to Johnson Street Holdings, LLC, one of his entities, for inadequate consideration to Debtor (see Johnson Street Holding Transfer, infra).

7.     Sutton was aided and abetted by the other Defendants in perpetrating the Fraudulent Transfers, the Reinsurance Scheme, the Voluntary Payment Scheme, the Centrix Funds Formation Scheme and in other wrongdoing designed to bleed Debtor Centrix Financial and other Debtors of their rightful assets and otherwise injure Debtors.  The other Defendants each also conspired with Sutton to perpetrate these unlawful ends.

8.     A constructive trust should be imposed on these Defendants, who are the wrongful beneficiaries of the Fraudulent Transfers and the Centrix Funds Formation Scheme to ensure that funds are rightfully returned to the Debtors.

9.      Based on this conduct, the Trust, as detailed below, brings actions against Sutton and/or the other Defendants as identified herein for Unjust Enrichment (Count I); Imposition of a Constructive Trust (Count II); Breach of Fiduciary Duty (Count III); Aiding and Abetting Breach of Fiduciary Duty (Count IV); Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544 and 550 and Colo. Rev. Stat. §38-8-101 *et seq*. (Count V); Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550 (Count VI); Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550 (Count VII); Recharacterization of Debt as Equity or, Alternatively, to Subordinate Debt (Count VIII); Avoidance and Recovery of Preferential Transfers Pursuant to 11 U.S.C. §§ 547(b) and 550(a)(1) (Count IX); Disallowance of Claims Under 11 U.S.C. § 502(d) (Count X); Conversion (Count XI); Civil Conspiracy (Count XII); Common Law Fraud (Count XIII); Civil Theft pursuant to Colo. Rev. Stat. 18-4-401 *et seq.* (Count XIV); and Alter Ego (Count XV).  The Trust seeks actual damages against all Defendants, as well as punitive damages for Defendants' wanton and willful misconduct, treble damages and attorney's fees against Sutton for his acts of civil theft, and other relief.

## II.      JURISDICTION AND VENUE

10.      This civil proceeding arises in a case under Title 11.

11.      This Court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 157(A) and 1334(B) and (E).

12.      This action is a core proceeding within the meaning of 28 U.S.C. §157(b)(2)(H) and (O).

13.      Venue of this action is proper in this district pursuant to 28 U.S.C. § 1409(a).

14.      The statutory bases for the relief requested in this complaint are 11 U.S.C. §§ 547, 544(b), 548, 550 and 502(d) and Rules 3007 and 7001 of the Federal Rules of Bankruptcy

Procedure and Colorado's Fraudulent Transfer Act, Colo. Rev. Stat. 38-8-101 *et seq.* and Colorado's Civil Theft Statute, Colo. Rev. Stat. 18-4-401 *et seq.*

### III.     THE BANKRUPTCY CASE

15.     The Debtors referred to herein are CMGN LLC ("CMGN"), CENTRIX FINANCIAL LLC ("Centrix Financial"), CENTRIX SERVICES, LLC ("Services"), CENTRIX TECHNOLOGY SUPPORT SERVICES LLC ("Technology"), CENTRIX SUPPORT LLC ("Support"), CENTRIX RESOURCE MANAGERS, INC. ("Resource"), and CENTRIX SERVICING LLC ("Servicing", and, collectively with CMGN, Centrix, Services, Technology, Support and Resource, the "Debtors").

16.     On September 4, 2006, one of the Debtors, CMGN, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada (the "Nevada Bankruptcy Court").

17.     On September 15, 2006 (the "Petition Date"), an involuntary petition under Chapter 11 of the Bankruptcy Code (the "Centrix Involuntary Case") was filed against Centrix Financial in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court").

18.     On September 19, 2006, Centrix Financial filed a voluntary petition under Chapter 11 of the Bankruptcy Code with the Nevada Bankruptcy Court (the "Centrix Voluntary Case") as did five other entities related to Centrix Financial and CMGN (Services, Technology, Support, Resource and Servicing).

19.     On September 27, 2006, the Nevada Bankruptcy Court entered an Order Authorizing Joint Administration and Use of Consolidated Caption for the cases pending in its jurisdiction, which allowed those cases to proceed as In re Centrix Financial, LLC, et al., jointly administered as Case No. 06-05631-GW3 (collectively, the "Nevada Cases").

20.    On September 27, 2006, the Nevada Bankruptcy Court transferred venue of the Nevada Cases to the Colorado Bankruptcy Court and such cases were assigned Case Nos. 06-16791 EEB through 06-16797.

21.    Centrix Financial did not file a response to the involuntary petition in the Centrix Involuntary Case within 20 days of its filing and was deemed by the Colorado Bankruptcy Court to have consented to the entry of an order for relief pursuant to section 303(h) of the Bankruptcy Code, 11 U.S.C. § 303(h).

22.    On October 11, 2006, the Colorado Bankruptcy Court entered an Amended Order on Joint Administration, Entering Order For Relief in Involuntary and Ordering Use of Amended Caption, wherein the Court: (1) entered an order for relief in the Centrix Involuntary Case; (2) consolidated the Centrix Involuntary Case with the Centrix Voluntary Case; (3) closed the Centrix Involuntary Case; and (4) administratively consolidated all of the cases under the name In re Centrix Financial, LLC, et al., Case No. 06-16403 (the "Chapter 11 Cases").

23.    The Debtors managed their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, 11 U.S.C. §§ 1107(a), 1108.

24.    On February 6, 2007, the Court approved the sale of the Debtors' assets.  The sale, to an entity now known as Flatiron Financial Services, Inc. and/or Peak5 ("Flatiron"), closed on February 23, 2007.

25.    On November 8, 2007, the Debtors and the Creditors' Committee filed with this Court a Liquidating Chapter 11 Plan Proposed by Debtors and Creditors' Committee, Dated November 8, 2007, and on January 25, 2008, the Debtors and the Creditors' Committee filed with this Court the Second Amended Chapter 11 Plan (the "Liquidating Plan").  On March 14, 2008, the Bankruptcy Court held a hearing on confirmation of the Liquidating Plan.  On May 16,

2008, the Bankruptcy Court entered an Order Confirming Second Amended Liquidating Chapter 11 Plan Proposed by Debtors and Creditors' Committee, Dated January 25, 2008 (the "Confirmation Order").  The Liquidating Plan became effective June 2, 2008.

## IV.    THE PARTIES

### A.    Plaintiff And Defendants

26.    The Plaintiff Trust was created pursuant to Article 7 of the Liquidating Plan.  The Liquidating Plan provides the following with respect to the assets of the Trust:

> D.    As of the Effective Date, title to all of Debtors' assets and property, including all claims, causes of actions and other interests, shall be vested in the Trust free and clear of any liens, claims, interests or encumbrances, and the Trust shall be considered the successor in interest to Debtors.  Debtors shall execute such documents as Trustee shall deem reasonably necessary to effectuate the vesting of title of such assets in the Trust.

Liquidating Plan, Article 7(D).

27.    The Liquidating Plan authorizes the Trustee of the Trust to commence adversary proceedings to enforce any claim or interest belonging to the Debtors:

> A.    *Adversary Proceedings*.  Trustee shall have the right to commence any adversary proceedings to enforce any claim or interest belonging to Debtors, including any claims or interests arising under Chapter 5 of the Bankruptcy code including §§ 542, 544, and 547 through 551 of the Bankruptcy Code, and shall further have the right to be substituted in the place and stead of the Debtors in any adversary proceedings pending as of the Effective Date.
>
> *        *        *
>
> B.    *Litigation*.  Trustee shall have the right to commence and defend litigation as necessary in any court of applicable jurisdiction, and shall have the right to be substituted in the place and stead of the Debtors in any litigation pending in any court of applicable jurisdiction as of the Effective Date.

28.    At all relevant times, Defendant Sutton controlled the Debtors as further described herein.

29.     Defendant Centrix Consolidated, LLC ("Consolidated") (of which Sutton was the majority owner) was the sole member of Debtor Centrix Financial.  Sutton was also the sole owner of Defendant RES Capital Holdings, Inc. ("RES Capital").  Sutton acted as Centrix Financial's Chief Executive Officer and Sutton and/or RES Capital was the manager of Centrix Financial.

30.     Debtor Centrix Financial was the sole member of Debtor CMGN.

31.     Sutton was the majority shareholder of Debtor Services.  Defendant RES Capital was the manager of Debtor Services.

32.     Debtor Centrix Financial was the sole member of Debtor Technology.

33.     Sutton was the sole member and manager of Debtor Support.

34.     Sutton was the sole shareholder and/or Chief Executive Officer and/or manager of Debtor Resource.

35.     Debtor Centrix Financial was the sole member of Debtor Servicing.

36.     Sutton was the owner and Manager of Defendant 6762 Potomac, LLC ("6762 Potomac").

37.     RES Capital was the sole owner of Defendant Johnson Street Holdings, LLC ("Johnson Street").

38.     Defendant Consolidated was at all times relevant hereto (including prior to and through February 2006) directly or indirectly owned and controlled by Sutton.  6762 Potomac, Sutton and/or RES Capital together owned 75% of voting stock in Consolidated, and Defendant Gerald E. Fitzgerald ("Fitzgerald") owned the remaining 25% of Consolidated.

39.     Defendant Centrix Funds, LLC ("Centrix Funds") was a non-debtor Delaware limited liability company formed by Sutton and owned by Centrix Financial to purchase from

automobile dealers and financial institutions, through a series of trusts, sub-prime automobile loans that were originated and serviced by Debtor Centrix Financial.  Ownership of Centrix Funds and Centrix Capital Management, LLC was transferred from Debtor Centrix Financial to Defendant Johnson Street effective on or about  January 1, 2004.

40.     Defendant Founders Insurance Company Ltd. ("Founders") was a Bermuda-domiciled reinsurer and a wholly-owned subsidiary of Defendant Williston Holdings, Ltd. ("Williston"), which in turn was a wholly-owned subsidiary of Centrix Consolidated.

41.     Sutton is an insider of the Debtors as defined by 11 U.S.C. § 101(31).

42.     Fitzgerald was the President of Centrix Financial LLC and is an insider of the Debtors as defined by 11 U.S.C. § 101(31).

43.     Defendant John Schreven ("Schreven") was the Vice-President of Insurance and Audits for the Debtors and is an insider of the Debtors as defined by 11 U.S.C. § 101(31).

44.     Defendant Roland Anderson ("Anderson") was the Executive Vice-President for insurance operations for the Debtors and is an insider of the Debtors as defined by 11 U.S.C. § 101(31).

45.     Upon information and belief, together with Sutton, Defendant Howard Klemmer ("Klemmer") directly or indirectly controlled Defendant Centrix Funds.  Klemmer also was a Senior Vice-President of Debtor Centrix Financial and the Chief Financial Officer of Defendant Centrix Funds.  Klemmer is an insider of the Debtors as defined by 11 U.S.C. § 101(31).

46.     Defendant Phoenix Capital Management ("Phoenix") was owned and/or controlled by Klemmer, and together with Sutton and Klemmer, controlled directly or indirectly Centrix Funds during the relevant time period.

47.     Defendant Lyndon Property Insurance Company ("Lyndon") provided DPI insurance for loans originated and serviced by Debtor Centrix Financial between 1998 and 2003.

48.     Defendants Katherine Sutton, Julie Sutton, Elizabeth Sutton and David Sutton each are family members/relatives of Sutton and each is an insider of the Debtors as defined by 11 U.S.C. § 101(31).

49.     Defendant Birdie, LLC ("Birdie") is an entity controlled by Sutton and/or his family members that received fraudulent transfers and engaged in other wrongdoing as enumerated herein.  Birdie is an insider of the Debtors as defined by 11 U.S.C. § 101(31).

50.     Defendant Grand Construction, LLC ("Grand Construction") is a company that was paid by the Debtors in connection with the construction of Sutton's residence and received fraudulent transfers and engaged in other wrongdoing as enumerated herein.

51.     Defendant Harrison Custom Builders, Ltd. ("Harrison Custom Builders") is a company that was paid by the Debtors in connection with the construction of Sutton's residence and received fraudulent transfers and engaged in other wrongdoing as enumerated herein.

52.     Defendant Design Management, Inc. is a company that was paid by the Debtors in connection with the construction of Sutton's residence and received fraudulent transfers and engaged in other wrongdoing as enumerated herein.

53.     John Does 1-50 were others who received wrongful transfers or who aided and abetted or conspired with the Defendants to commit wrongdoing enumerated below.

**B.     Non-Party Principal Players**

54.     The credit unions referred to in this Complaint are various credit unions throughout the United States which advanced funds for sub-prime automobile loans (which loans were originated and serviced by Debtor Centrix Financial).

55.     Non-debtor Everest National Insurance Company ("<u>Everest</u>") provided DPI insurance for certain loans originated and serviced by Debtor Centrix Financial beginning in 2003.

56.     Non-debtor Universal International Insurance Company Limited ("<u>Universal</u>") was a Bermuda-domiciled insurance company which provided DPI insurance on certain loans originated by Debtor Centrix Financial in 2003.  Upon information and belief, Universal issued no DPI insurance policies.

57.     Universal reinsured the risk of loss on certain loans originated by Debtor Centrix Financial with Universal Re-Insurance Company, Ltd. ("<u>Universal Reinsurance</u>").  Sutton was given a 100% participation interest in Universal Reinsurance's profits on the reinsurance transaction with Universal via a Participation Agreement dated as of November 1, 2003 between Universal Reinsurance and himself.

**V.      GENERAL ALLEGATIONS**

**A.      <u>Background Regarding The Debtors' Business</u>**

58.     In very general terms, Debtor Centrix Financial originated and serviced sub-prime automobile loans.  Sub-prime automobile loans are loans that are made to borrowers with sub-prime credit scores, and thus carry with them more risk of default than prime automobile loans.

**i.      <u>Ownership Structure</u>**

59.     In 1997, Sutton and a group of other investors purchased Centrix Financial Corporation.  Subsequently, Centrix Financial Corporation was reorganized into Debtor Centrix Financial.

60.     Centrix Financial was the Debtors' primary operating company.

ii.      **The Reinsurance Scheme**

a.       **Origination of sub-prime automobile loans**

61.      From 1998 until the Petition Date, with the support of other Debtors and non-Debtors controlled by Sutton, Debtor Centrix Financial originated, underwrote and serviced sub-prime automobile loans.

62.      Debtor Centrix Financial did not finance the loans.  Instead, the funds for the loans were advanced by various credit unions and by Defendant Centrix Funds.

b.       **Sutton's PMP Scheme**

63.      To induce the credit unions to fund the loans, Sutton represented that he had developed a safe and profitable product that would enable the credit unions to enter the sub-prime automobile financing market – a very risky but potentially lucrative sector in consumer finance.  Sutton called the product the Portfolio Management Program or "PMP."

64.      The key to PMP that made it so appealing to the credit unions was insurance of every loan against the risk of loss.  Sutton and Debtor Centrix Financial represented to the credit unions that every loan funded by the credit unions would be protected by Default Protection Insurance ("DPI") and Vendor Single Insurance ("VSI" or "skip insurance").  Simply stated, if a borrower defaulted on the loan, the credit union would receive from a DPI carrier the difference between the value of the repossessed car (the auction sale price or the Kelly Blue Book price, whichever is lower) and the unpaid loan amount.

65.      Thus, coverage under the DPI policy depended, among other things, on the car being repossessed.  If the car could not be repossessed due to, for example, the borrower absconding with the property, the VSI carrier was obligated to pay the claim.

66.     Upon information and belief, to further alleviate the risk of default, Debtor Centrix Financial was obligated to underwrite the loans in accordance with the guidelines approved by the insurance carriers.

67.     By touting the insurance feature of PMP, Debtor Centrix Financial became one of the leaders in the sub-prime automobile servicing industry.  At the height of its business, Debtor Centrix Financial was originating tens of thousands of loans every month in almost all of the United States and working with more than one hundred credit unions.

68.     As of the Petition Date, approximately 144,000 loans worth $1.9 billion were outstanding.  Debtor Centrix Financial was servicing these loans.

### c.     Lyndon provides insurance

69.     Lyndon began to provide DPI coverage for loans originated by Debtor Centrix Financial in 1998.  Debtor Centrix Financial acted as Lyndon's agent in underwriting and issuing the insurance policies on the loans pursuant to an Agency Agreement effective August 1, 1998.

70.     In or around 2000, Lyndon was acquired by Protective Life Insurance Company.

71.     Upon information and belief, between 1998 and 2002, neither Sutton nor any of his affiliated companies provided reinsurance to Lyndon with respect to sub-prime auto loans Centrix Financial produced and Lyndon insured.

### d.     Founders provides reinsurance

72.     Effective January 1, 2002, non-Debtor Founders, which was controlled directly or indirectly by Sutton, agreed to reinsure Lyndon with respect both to policies already in force (issued prior to January 1, 2002) and new policies (issued after January 1, 2002), for 90% of every claim up to 110% loss ratio.  Founders was entitled to Unearned Premium Reserve with respect to in force policies minus 24%.  With respect to new policies, Founders was entitled to 90% of net premium (minus ceding commissions and fees).  Founders was also obligated to pay

90% of established reserves with respect to claims on in-force policies and 90% of every claim arising from policies issued on or after January 1, 2002.

73.     Effective January 1, 2003, Founders' reinsurance obligation to Lyndon with respect to new policies increased to 100% and the aggregate loss ratio cap was eliminated.

74.     Thus, Lyndon essentially provided Debtor Centrix Financial with insurance paper, which Debtor Centrix Financial needed for the loans.  Lyndon charged a ceding commission and other fees (as a percentage of written premium) for allowing Debtor Centrix Financial to use Lyndon as an insurer in this fashion.  Founders received the balance of the premium paid for the loans which it ostensibly reinsured.

75.     Beginning in approximately 2003, Sutton caused Debtor Centrix Financial to guarantee Founders' reinsurance obligations to Lyndon.

    e.     **Lyndon's amendment to its insurance agreements**

76.     On or about April 11, 2003, Lyndon and Debtor Centrix Financial executed an amendment to the Agency Agreement (the "Amendment").  The Amendment was made retroactive to January 1, 2003.

77.     With the Amendment, Lyndon effectively ended its insurance business with the Debtors with respect to new policies.  In particular, the Amendment required Debtor Centrix Financial to locate a new DPI carrier and placed new limitations on the volume for new policies in 2003.

78.     The Debtors did not receive reasonably equivalent value in exchange for the Amendment.

79.     The Amendment also provided that, with respect to insurance policies issued in any calendar year by Lyndon, Debtor Centrix Financial would be obligated to pay any claims that would otherwise be paid by Lyndon at the point in time when a claims frequency rate

15

exceeded 15%.  This meant, for example, that if 100 loans were outstanding, and 15 of those loans were the basis of claims to Lyndon, then Debtor Centrix Financial would be obligated to pay all further claims made under any of the remaining 85 loans.

80.     The provision identified in the preceding paragraph is tantamount to Debtor Centrix Financial providing reinsurance to Lyndon.  Thus, Debtor Centrix Financial was left with a liability to pay claims after a 15% claims frequency rate was reached, and Founders received millions in premiums, yet only a small liability for claims below the 15% frequency rate.

81.     Upon information and belief, Sutton caused Debtor Centrix Financial, which guaranteed Founders' reinsurance liability, to pay claims directly to Lyndon.

82.     In addition, the Amendment required Debtor Centrix Financial to establish a reserve fund for post-April 1, 2003 loans that were insured by Lyndon and reinsured by Founders.  Debtor Centrix Financial was required to reserve 25% of Founders' risk, and Lyndon was given discretion to access this reserve fund for payment before being paid by Founders.  The Amendment provided in relevant part:

(L)     General Agent agrees that with respect to insurance policies issued in any calendar year, at the point in time at which the 15% claims frequency rate is exceeded, any claims that would otherwise be paid by such insurance policies shall be paid by General Agent.  General Agent shall report such payments to Lyndon.

(M)     General Agent agrees to establish an account (the "Custodial Account") pursuant to the Custodial Account Agreement which is attached to the Agreement as Exhibit C.  With respect to loans originated on or after April 1, 2003, the Custodial Account shall be funded with a payment by General Agent by the 15th of the month of:  (i) $250 per insured loan processed in the preceding month (regardless of whether Lyndon is the carrier), net of up to $150,000 per month to cover payments that General Agent has made in the preceding month pursuant to subsection (L) above; and (ii) the amount allocated pursuant to subsection (N) below for the previous month, net of the fee payment to Lyndon pursuant to subsection (N) below for the previous month.  Amounts shall continue to be added to the

16

Custodial Account until such time as the total amount of funds in the Custodial Account equals 25% of the total amount of the unearned premium and claim reserves as determined under the Reinsurance Agreement effective January 1, 2002 between Lyndon and Founders Insurance Company Ltd. (the "Reinsurance Agreement") for business issued under this Agreement (the "Guaranteed Deposit Amount"). If, as of the end of any calendar month, the balance in the Custodial Account exceeds the Guaranteed Deposit Amount, Lyndon shall within 10 days after the end of such month instruct the custodian of the Custodial Account to disburse such excess to General Agent. Following the first such disbursement pursuant to the preceding sentence, if, as of the end of any calendar month, the Guaranteed Deposit Amount exceeds the balance in the Custodial Account, General Agent shall deposit into the Custodial Account funds as may be necessary to bring the balance in the Custodial Account to an amount equal to the lesser of the Guaranteed Deposit Amount and the highest balance ever maintained in the Custodial Account.

(N)     General agent agrees that for all loans originated on or after April 1, 2003 it will allocate an amount equal to the difference, if any, between (i) a premium rate of 10 ½% of the amount financed and (ii) the actual premium amount charged by Lyndon, excluding, in both cases, any separate premium associated with policy endorsements. Pursuant to subsection (M) above, the balance shall be deposited into the Custodial Account and shall serve as additional security for General Agent's obligations under subsection (L) above and as security for General Agent's obligations as guarantor under the April 7th, 2003 Guaranty between General Agent and Lyndon. Lyndon shall request no further increases in the premium rate beyond the 10 ½% level plus any separate premium associated with policy endorsements; provided, however, that if circumstances arise allowing General Agent to terminate this Agreement pursuant to Section 10, General Agent's consent shall not thereafter be required for Lyndon to change such standards.

83.     Via letter dated October 29, 2003, Debtor Centrix Financial permitted Lyndon to draw down a $6 million letter of credit in order to satisfy Debtor Centrix Financial's obligations under subparagraphs M and N above.

84.     Payments made to or for the benefit of Lyndon pursuant to the Amendment were made without Debtors receiving reasonably equivalent value in return, because the Amendment caused Debtors to take on greater obligations with respect to claims in exchange for Lyndon effectively terminating its relationship with the Debtors with respect to new loans.

85.     In addition, upon information and belief, Lyndon received premium for loans that were not insured by Lyndon.

86.     Through the conduct described above, the downside risk of Founders' obligations was shifted to and borne by Debtor Centrix Financial while Founders and Lyndon (as well as Defendants Centrix Consolidated, Williston and ultimately Sutton) enjoyed the upside of the premiums paid and other perquisites.

> ### f.     Universal provides insurance

87.     Debtor Centrix Financial entered into an Insurance Placement and Administration Agreement with Universal effective November 1, 2003.  Pursuant to this Agreement, Universal agreed to provide insurance to numerous loans issued by Centrix Financial that were not eligible to be placed with Lyndon.

88.     Universal reinsured 100% of the risk with Universal Reinsurance.  Sutton was given a 100% participation in Universal Reinsurance's profits from this transaction and Sutton was paid a $5,000,000 fee for this transaction.

89.     Upon information and belief, Sutton caused Debtor Centrix Financial to enter into a Claims Frequency Cap Agreement with Universal, which obligated Debtor Centrix Financial to pay every claim under Universal policies once the claims frequency rate reached 18%, with an aggregate limit of 115%.

90.     Thus, similar to the Lyndon-Founders-Centrix Financial arrangement, Debtor Centrix Financial was left with a liability to pay and, upon information and belief, did pay a majority of the claims, while Universal Reinsurance – a Sutton-controlled offshore entity – received and enjoyed millions of dollars in premiums and Sutton received large fees for himself for arranging this.

g.     **Everest provides insurance**

91.     Effective August 1, 2003, Everest began to provide DPI insurance to loans originated and underwritten by Debtor Centrix Financial.

92.     As part of the transaction, Everest required Founders to provide reinsurance and further required Sutton to personally guarantee Founders' obligations to Everest.

93.     This gave Sutton a further incentive to take actions that would harm Debtor Centrix Financial and protect Founders and himself.  If Founders' liability was low, Sutton would not have to pay personally on his guarantee and would profit from the reinsurance deal.

94.     Debtor Centrix Financial was named as an additional insured under the Everest insurance policy.

95.     Upon information and belief, coverage under the Everest insurance policy was contingent upon each loan: (a) satisfying the underwriting guidelines, and (b) securing physical damage insurance.

96.     Upon information and belief, Sutton, however, caused Debtor Centrix Financial to underwrite numerous loans in violation of the guidelines, thus threatening coverage for these loans.

97.     Upon information and belief, instead of ensuring that VSI coverage was in place, Sutton allowed this coverage to lapse effective July 2005, thus exposing Debtor Centrix Financial to risk on thousands of loans.

98.     In separate litigation brought against him by Everest, Sutton has claimed that a great number of loans should not be insured under the Everest Policy because they were allegedly written in violation of the underwriting guidelines. If true, Sutton's scam has the effect of Founders (and indirectly, Sutton) receiving millions of dollars in premiums with no liability, because Founders' liability is derivative of the coverage afforded under the Everest policy.  By

19

forcing Debtor Centrix Financial to assume liability for claims arising from insurance policies provided by Lyndon, Universal, and Everest, Sutton caused significant harm to Debtor Centrix Financial and its creditors while reaping enormous benefits through Founders.  In this, too, he was aided and abetted by Williston and Centrix Consolidated.

99.     By forcing Debtor Centrix Financial to pay for claims arising from insurance policies provided by Lyndon, Universal, and Everest, Sutton caused significant harm to Debtor Centrix Financial and its creditors while reaping enormous benefits through Founders.

100.     In addition, through the above-described conduct Sutton caused the credit unions to pay substantial premiums for insurance coverage that in reality they were not receiving.

101.     In June 2005 the National Credit Union Association ("NCUA") issued Risk Alert 05-RISK-01.  The alert targeted credit unions that conducted business with sub-prime automobile loan underwriters that also provided insurance in connection with the origination of the loans.  NCUA identified its concerns that credit unions had engaged in outsourced, indirect, sub-prime automobile lending without effective controls and monitoring systems in place, which posed a risk to credit union's net worth.

102.     The activities identified herein in Part (A)(ii)(a) – (g) are what is referred to in the Nature of Case as the "Reinsurance Scheme."

**B.     The Fraudulent Transfers From Debtors To Sutton And To Other Defendants TRANSFERS—GENERAL**

**Tax Payments**

103.     Sutton has admitted and the Debtors' records reflect that Sutton received at least the following sums from Centrix Financial and/or Services – more than $9.7 million – allegedly to pay his personal tax liability:  $3.5 million on September 22, 2005; $1.2 million on October 20, 2005; and $4.5 million in April 2005.  On information and belief, Sutton also received an

additional $526,000 from Debtor Centrix Financial and/or Services to pay his personal tax liability on an unidentified date.

104.    In addition, upon information and belief, Sutton received $5 million in March 2004 from one or more of the Debtors, allegedly to pay his personal tax liability.

**Sutton Residence**

105.    On or about the following dates, Services made at least the following payments for the ultimate benefit of Sutton and/or his Defendant family members in connection with the construction of a personal residence, totaling at least the sum of approximately $2.4 million for which Debtors received no reasonably equivalent value:

A.    Defendant Grand Construction

     i.    January 10, 2005, in the amount of $22,227.94;

     ii.    March 10, 2005, in the amount of $86,576.83;

     iii.    April 11, 2005, in the amount of $37,519.75;

     iv.    June 24, 2005, in the amount of $170,999.71;

     v.    July 19, 2005, in the amount of $15,376.11;

     vi.    August 3, 2005, in the amount of $50,000; and

     vii.    August 8, 2005, in the amount of $6,591.80.

B.    Defendant Harrison Custom Builders

     i.    January 10, 2005, in the amount of $339,468.16;

     ii.    February 10, 2005, in the amount of $586,015.33;

     iii.    March 10, 2005, in the amount of $319,314.23;

     iv.    April 11, 2005, in the amount of $366,631.64; and

     v.    July 19, 2005, in the amount of $74,398.83.

C.    Defendant Design Management, Inc.

    i.        January 21, 2005, in the amount of $125,000;

    ii.       March 17, 2005, in the amount of $50,000;

    iii.     April 28, 2005, in the amount of $20,000;

    iv.     May 16, 2005, in the amount of $20,000;

    v.       July 3, 2005, in the amount of $25,000;

    vi.     July 6, 2005, in the amount of $80,000; and

    vii.    August 11, 2005, in the amount of $30,000.

**Transfers to Centrix Officers**

106.    On or about the following dates, Services transferred to Sutton the following sums totaling $138,700 for which no reasonably equivalent value was received:

    A.     June 21, 2005, in the amount of $50,000

    B.     July 1, 2005, in the amount of $8,700

    C.     November 28, 2005, in the amount of $80,000

107.    On or about the following dates, Debtor Centrix Financial transferred to Sutton at least the following sums totaling approximately $839,004 for which no reasonably equivalent value was received:

    A.     On each of October 3, 2005; October 13, 2005; December 1, 2005; January 3, 2006; February 3, 2006; February 28, 2006; April 3, 2006; April 28, 2006; June 5, 2006; and August 1, 2006, in the amount of $53,333.33 in each instance;

    B.     March 14, 2006, in the amount of $25,000;

    C.     March 22, 2006, in the amount of $50,000;

    D.     March 23, 2006, in the amount of $100,000;

    E.     April 6, 2006, in the amount of $5,000;

    F.     April 12, 2006, in the amounts of $10,000 and $80,000;

    G.     April 13, 2006, in the amount of  $10,000;

    H.     April 19, 2006, in the amount of  $5,000;

      I.      April 24, 2006, in the amount of  $15,000; and

      J.      August 15, 2006, in the amount of $5,671.24.

108.      Upon information and belief, between October 2005 and April 2006, Debtor Centrix Financial paid the sum of at least approximately $9,552, on approximately the following dates and in at least the following amounts, for the benefit of Sutton and/or his Defendant family members to Tiffany & Co.:

      A.      October 12, 2005, in the amount of $781.53

      B.      October 20, 2005, in the amount of $409.80

      C.      November 7, 2005, in the amount of $864.88

      D.      December 20, 2005, in the amount of $1,311.46

      E.      January 24, 2006, in the amount of $841.20

      F.      February 16, 2006, in the amount of $2,122.33

      G.      March 23, 2006, in the amount of $1,271.60

      H.      April 28, 2006, in the amount of $1,949.70

109.      On or about February 20, 2005 and March 17, 2005, Services paid the sum of at least approximately $14,014.52 for the benefit of Sutton and/or his Defendant family members in connection with his anniversary, for which no reasonably equivalent value was received by Debtors.

110.      On information and belief, on or about November 21, 2005, Debtor Centrix Financial paid the sum of at least approximately $74,650 for the benefit of Sutton and/or his Defendant family members to Walt Disney Online, for which no reasonably equivalent value was received by Debtors.

111.      The transfers identified in the preceding paragraphs in this subsection are hereafter the "Sutton Transfers."

**American Express Payments**

112.    As further explained below, Centrix Financial paid personal expenses incurred by Sutton and certain of his Defendant family members on at least two American Express business credit card accounts in 2005 and 2006 in the amount of at least approximately $640,379, for which no reasonably equivalent value was received by Debtors.

**AMEX Account No. 11001**

113.    Between January 2005 and December 2005, the Debtors paid Sutton and/or his Defendant family members' personal expenses, totaling at least approximately $201,037, on or about the following dates, for Account No. ****-******-11001 ("AMEX Account No. 11001"), for which no reasonably equivalent value was received by Debtors:

> A.    January 18, 2005, in the amount of $58,198.02
>
> B.    April 17, 2005, in the amount of $54,470.69
>
> C.    September 23, 2005, in the amount of $38,851.08
>
> D.    November 14, 2005, in the amount of $15,693.89
>
> E.    December 1, 2005, in the amount of $19,512.84
>
> F.    December 29, 2005, in the amount of $17,310.71

114.    Between January 2006 and June 2006, the Debtors paid Sutton's family's personal expenses totaling at least approximately $177,891, including those reflected on the following Debtor Centrix Financial invoices, for AMEX Account No. 11001, for which no reasonably equivalent value was received by Debtors:

> A.    Invoice No. 4101 in the amount of $26,515.47
>
> B.    Invoice No. 4103 in the amount of $41,047.25
>
> C.    Invoice No. 4115 in the amount of $110,328.20

115.    Of the $177,891 paid by Debtor Centrix Financial to satisfy charges on AMEX Account No. 11001, approximately $53,880 was attributable to Sutton; $1,803 was attributable to Sutton's wife, Defendant Julie Sutton; $98,123 was attributable to Sutton's daughter, Defendant Katherine Sutton; and $24,084 was attributable to Sutton's son, Defendant David Sutton.

### AMEX Account No. 12005

116.    Between May 2005 and December 2005, the Debtors paid Sutton's personal expenses totaling at least approximately $107,949, including those reflected on the following American Express invoices for Account No. ****-******-12005 ("AMEX Account No. 12005"), for which no reasonably equivalent value was received by Debtors:

        A.    May 21, 2005, in the amount of $5,783.44;

        B.    June 20, 2005, in the amount of $15,786.55;

        C.    September 19, 2005, in the amount of $24,249.10;

        D.    October 19, 2005, in the amount of $19,927.31;

        E.    November 19, 2005, in the amount of $10,547.60; and

        F.    December 19, 2005, in the amount of $31,655.50.

117.    Between January 2006 and June 2006, the Debtors paid Sutton's personal expenses totaling at least approximately $153,502, including those reflected on the following Centrix Financial invoices, for AMEX Account No. 12005, for which no reasonably equivalent value was received by Debtors:

        A.    Invoice No. 4104 in the amount of $983.90; and

        B.    Invoice No. 4114 in the amount of $152,518.41.

118.    The transfers involving American Express payments identified in the preceding paragraphs in this subsection are hereafter the "Sutton Family Amex Transfers."

**Birdie LLC**

119. Services paid expenses totaling at least $235,000 for Defendant Birdie, a clothing company owned and/or controlled, directly or indirectly, by Sutton and his daughter Defendant Katherine Sutton, on approximately the following dates in at least the following amounts, for which no reasonably equivalent value was received:

      A.     December 31, 2004, in the amount of $5,000;

      B.     March 4, 2005, in the amount of $100,000;

      C.     April 8, 2005, in the amount of $5,000;

      D.     April 22, 2005, in the amount of $35,000;

      E.     May 2, 2005, in the amount of $5,000;

      F.     May 18, 2005, in the amount of $10,000;

      G.     May 31, 2005, in the amount of $45,000;

      H.     June 13, 2005, in the amount of $5,000; and

      I.     November 28, 2005, in the amount of $25,000.

120. The transfers related to Birdie are hereafter referred to as the "Birdie Transfers."

**Family Salaries**

121. Debtors, including but not limited to Debtor Centrix Financial, paid Sutton a salary of an unknown certain sum, but for which, upon information and belief, no reasonably equivalent value was received by the Debtors due to Sutton's actions as alleged herein.

122. Between September 20, 2005 and September 19, 2006, Debtor Centrix Financial paid salaries totaling at least approximately $296,628 to the following Sutton family members in at least the following amounts, for which no reasonably equivalent value was received by Debtors:

      A.     Defendant Julie Sutton received $238,462;

    B.  Defendant Elizabeth Sutton received $10,500; and

    C.  Defendant Katherine Sutton received $44,056 through payroll and an additional $3,610 check payment on or about July 26, 2006, which was not processed through Centrix Financial's payroll system.

  123.  The transfers related to the salaries identified in the two preceding paragraphs are hereafter the "Sutton Family Salary Transfers."

**Miscellaneous**

  124.  On or about April 4, 2005, Services transferred to Defendant Fitzgerald the sum of $200,000 for which no reasonably equivalent value was received (the "Fitzgerald Transfer").

  125.  On or about 2004, Sutton caused Debtor Centrix Financial to transfer ownership of Centrix Capital Management LLC and Centrix Funds to Johnson Street, an entity that Sutton admits he owned and controlled, in exchange for a $1.16 million receivable.

  126.  The receivable was concealed by Sutton and subsequently eliminated, with the result that Centrix Financial did not receive adequate consideration or reasonably equivalent value for the transfer.  This transfer is hereafter referred to as the "Johnson Street Holding Transfer."

**TRANSFERS-PREPETITION LOAN TRANSACTION**

  127.  In January 2006, Sutton sold an ownership interest in Consolidated in exchange for a $26.7 million loan from Falcon Mezzanine Partners II, L.P. and Kendrick Centrix Holdings Corp.  At that time, Falcon Mezzanine Partners II, LP ("Falcon") and Kendrick Centrix Holdings Corp. ("Kendrick") (collectively, the "Prepetition Lenders") purported to loan $26.7 million to Defendant Consolidated.  This "loan to own" transaction (the "Prepetition Loan Transaction") was undertaken at a time when Debtor Centrix Financial and other Debtor guarantors appear to have been insolvent (and certainly rendered the Debtor guarantors insolvent).

128.    As security for the Pre-Petition Loan to Defendant Consolidated, Debtor Centrix Financial, as well as its affiliated Debtors, pledged substantially all assets to the Prepetition Lenders.

129.    Sutton arranged for the Debtors to pledge substantially all of their assets to the Prepetition Lenders for a loan to non-Debtor Consolidated.

130.    Sutton further arranged for disposition of the loan proceeds.

131.    In substance, the Prepetition Loan Transaction was not a loan to or for the benefit of Debtor Centrix Financial or the other Debtors.  Rather, it was essentially a loan to Sutton and to the non-Debtor affiliates owned and controlled by Sutton, secured by the Debtors' assets.

132.    Sutton then used the proceeds for his or his affiliates' benefit, to the detriment of the Debtors and their creditors.

133.    The Debtors:  (i) did not receive reasonably equivalent value for the pledges of their assets in connection with the Prepetition Loan Transaction; and (ii) the substantial majority of the proceeds of the Prepetition Loan Transaction did not benefit the Debtors.

134.    Sutton diverted the Prepetition Loan Transaction proceeds for his own benefit to the following and/or ultimately to himself:

      A.     $11,652,854.00 was diverted to Defendant 6762 Potomac; this allowed Sutton and/or Defendant 6762 Potomac to pay an outstanding mortgage debt;

      B.     $327,000 was diverted to Grand Prix of Denver, LLC, another entity indirectly owned and controlled by Sutton;

      C.     $1.48 million was diverted to Centrix Motor Sports, LLC, an entity owned and controlled by Sutton;

      D.     $91,000 was diverted to pay for a NASCAR event attended by Sutton and his family, employees of Centrix Motor Sports, LLC, and others;

      E.     $63,000 was paid to Bates White LLC for services rendered to Defendant Centrix Funds;

F.      $100,000 was paid to Sentient Jet for Sutton's personal leased jet membership;

G.      $20,000 was paid to Interior Alterations for fence and sprinkler systems related to property not owned or used by Debtor Centrix Financial; and

H.      $423,045 was diverted to Defendant 6762 Potomac and used by 6762 Potomac to purchase an unpaved parking lot located next to Debtor Centrix Financial's offices.

135.    The transfers identified in the preceding paragraph are hereafter referred to as the "Prepetition Loan Transfers."

136.    The Sutton Transfers, Sutton Family Amex Transfers, Birdie Transfers, Sutton Family Salary Transfers, Fitzgerald Transfer, Johnson Street Holding Transfer and Prepetition Loan Transfer are hereafter collectively referred to as the "Fraudulent Transfers".

**C.      The Voluntary Payment Scheme Improperly Siphons Money From Debtors**

137.    Sutton and other insiders caused Debtor Centrix Financial to make payments to credit unions, and/or to Lyndon, Universal or Everest, between at least 2002 and 2006, in the amount of approximately $113 million, some or all of which were made for the benefit of Sutton and/or his non-Debtor entities and insiders and to the detriment of the Debtors.

138.    Some or all of these payments were made without Debtor Centrix Financial having a legal obligation to make them and/or when any such obligation was unlawful.

139.    Debtor Centrix Financial did not receive adequate consideration or reasonably equivalent value for these payments.

140.    Among these payments are insurance payments in the total amount of approximately $56 million that Sutton caused Debtor Centrix Financial to make to credit unions and/or to Lyndon, Universal or Everest, as if Debtor Centrix Financial were the insurer.

141.    Among these payments are payments that were made to cover up first payment defaults on loans, for reasons that include artificially deflating the default rate on loans and prolonging the Reinsurance Scheme.

142.    The payments referred to in this subsection are hereafter referred to as the "Voluntary Payments."

143.    Debtor Centrix Financial had no legal obligation to make some or all of the Voluntary Payments.

144.    Certain of the Voluntary Payments that were made to or for the benefit of Lyndon were made without Debtors receiving reasonably equivalent value in exchange.

145.    Debtor Centrix Financial did not receive adequate consideration in exchange for making the Voluntary Payments, some or all of which directly benefited Sutton (by reducing liability of Founders – the reinsurer of Lyndon and Everest – and Universal Reinsurance – the reinsurer of Universal).

146.    The Voluntary Payments prolonged and concealed Sutton's activities that benefited Sutton and caused the Debtors financial ruin.

**D.    Sutton And Other Defendant Insiders Perpetrate The Centrix Funds Formation Scheme and the Johnson Street Holding Transfer**

147.    Upon information and belief, in or about 2003, Sutton and other insider Defendants, both directly and indirectly through Defendant Consolidated, caused Debtor Centrix Financial to transfer assets belonging to it to create non-debtor Defendant Centrix Funds.

148.    Sutton, Klemmer and/or Phoenix, directly or indirectly, controlled Defendant Centrix Funds.

149.    Upon information and belief, Sutton and Klemmer, who owed fiduciary duties to the Debtors, caused and/or assisted in this transfer.

150.    Debtors, including Debtor Centrix Financial, did not receive reasonably equivalent value in exchange for the transfers that created Defendant Centrix Funds.

151.    The transfers that created Defendant Centrix Funds served no legitimate business purpose for Debtors, and Defendant Centrix Funds at all relevant times has been run for the benefit of Defendants Sutton, Klemmer, Phoenix and/or other insiders.

152.    After creating Defendant Centrix Funds, Sutton, Klemmer and others in league with them devoted their energies to protecting and enriching Defendant Centrix Funds while taking affirmative steps, including as described above, to bleed Debtor Centrix Financial of its assets.

153.    In January 2004, Sutton, Klemmer, Phoenix and other insider Defendants caused Defendant Centrix Funds to be transferred to Defendant Johnson Street, another of Sutton's entities, for which Debtors did not receive reasonably equivalent value.  See Johnson Street Holding Transfer, supra.

154.    Sutton, Fitzgerald, Klemmer, Phoenix and other insider Defendants benefitted from the Johnson Street Holding Transfer.

## COUNT I:  UNJUST ENRICHMENT

155.    Plaintiff realleges the preceding paragraphs as though stated fully herein.

156.    This Count I for Unjust Enrichment is pled against all of the Defendants.

157.    As alleged herein, Debtors transferred to each of the Defendants the Fraudulent Transfers for which no services were rendered by each Defendant and/or without the Debtors receiving reasonably equivalent value in exchange for the transfers, as alleged in the General Allegations.

158.     As alleged herein, some or all of the Voluntary Payments, including those made to or for the benefit of Lyndon and Founders, were made without the Debtors receiving reasonably equivalent value in exchange.

159.     As alleged herein, Defendants Sutton, Fitzgerald, Anderson, Schreven, Klemmer, Centrix Consolidated, Centrix Funds, Founders, Johnson Street, Phoenix, RES Capital, Lyndon and Williston caused the Reinsurance Scheme, Voluntary Payment Scheme and the Centrix Funds Formation Scheme for which the Debtors received no reasonably equivalent value and/or to the harm and detriment of the Debtors.

160.     Each such action as alleged herein conferred a benefit upon such Defendant from the Debtors.

161.     Each such benefit was conferred at Debtors' expense.

162.     Each of the Defendants has failed and/or refused to repay the sums owing to the Debtors, notwithstanding the legal obligation to do so.

163.     Circumstances make it unjust for each Defendant to retain the benefits as alleged herein without providing commensurate compensation to Debtors.

164.     Accordingly, it would be inequitable to allow each such Defendant to retain the benefits alleged herein, and each such Defendant would be unjustly enriched if permitted to retain the benefits alleged herein.

165.     To the extent that any contracts existed between the parties that relate to the factual allegations that support Plaintiff's claim for unjust enrichment, such contracts are unconscionable and void, based on the factual allegations set forth herein.

WHEREFORE, Plaintiff demands a judgment against each such Defendant, in an amount of actual damages for each such Defendant's unjust enrichment subject to proof at trial, but not

less than the amount alleged herein, together with interest and costs, and for such other and further relief as the Court deems equitable and appropriate.

## COUNT II:  IMPOSITION OF CONSTRUCTIVE TRUST

166.    Plaintiff realleges the preceding paragraphs as through stated fully herein.

167.    This Count II for the imposition of Constructive Trust is pled against Defendants Birdie, Johnson Street, 6762 Potomac, Founders and Centrix Funds.

168.    Defendants Birdie, Johnson Street, 6762 Potomac, Founders, Williston and Centrix Funds are or were at all relevant times each Sutton-controlled entities.

169.    Sutton at all times dominated and controlled the Debtors.  He also owed each Debtor an obligation as a fiduciary and an officer and/or principal shareholder or principal decision-maker.  His power vis-à-vis Debtors created a confidential relationship as between Sutton and Debtors and as between Debtors and each Defendant named in this Count.

170.    With respect to each of the Birdie Transfers, Johnson Street Holdings Transfer, Prepetition Loan Transfer in favor of 6762 Potomac, the Reinsurance Scheme and the Centrix Funds Formation Scheme (which resulted in the creation of Centrix Funds, as well as the subsequent Johnson Street Holdings Transfer), Debtors had a right to expect Sutton and the other Defendants to this Count to act in Debtors' best interests.

171.    Sutton and each of the Defendants in this Count abused his or its position of confidence and power by causing Debtors to improperly transfer property belonging to Debtors to or for the benefit of each Defendant herein.  Each such transfer served no legitimate purpose and was designed and had the effect of advantaging Sutton and each of the Defendants herein, while disadvantaging Debtors.

172.    The equities are such that it would be wrongful to permit each of the Defendants to this Count to keep property that was improperly transferred to it but that rightfully belongs to Debtors.

173.    Each of the Defendants to this Count has been unjustly enriched by the transfers and conduct described herein.

174.    A constructive trust should be imposed upon each of the accounts, assets, property and/or holdings of each of the Defendants to this Count sufficient to repay Debtors what is rightfully theirs.  Such a Constructive Trust should attach to all accounts, assets, property and/or holdings of Centrix Funds and all accounts, assets and/or holdings of each of the other Defendants to this Count until the transfer to each is repaid.

WHEREFORE, Plaintiff respectfully prays that this Court impose a Constructive Trust upon the accounts, assets, property and/or holdings of each of the Defendants to this Count in the following manner:

(a)    as to Centrix Funds, such trust to continue until all of its accounts, assets, property and holdings are returned to Debtors;

(b)    as to Birdie, such trust to continue until the Birdie Transfer is repaid;

(c)    as to 6762 Potomac, such trust to continue until the $11,652,842 transferred to pay mortgage debt and $423,045 to purchase a parking lot is repaid;

(d)    as to Founders, such trust to continue until the Debtors are repaid all funds transferred to or for the benefit of Founders;

(e)    as to Williston, such trust to continue until the Debtors are repaid all funds transferred to or for the benefit of Founders and Williston; and

34

(f) as to Johnson Street, until the Johnson Street Holding Transfer is repaid

and Centrix Funds is returned to Debtors' ownership.

together with interest and costs and for such other and further relief as the Court deems equitable

and appropriate.

## COUNT III:  BREACH OF FIDUCIARY DUTY

175.    Plaintiff realleges the preceding paragraphs as though stated fully herein.

176.    This Count III for breach of fiduciary duty is pled against Defendants Sutton,

Fitzgerald, Klemmer, Anderson and Schreven.

177.    At all relevant times, Sutton, Fitzgerald, Klemmer, Anderson and Schreven were

owners and/or officers of the Debtors, and controlled, directly or indirectly, each of the Debtors,

exercising power and control over the Debtors.

178.    As such, Sutton, Fitzgerald, Klemmer, Anderson and Schreven each owed

fiduciary duties to the Debtors to not use his power to control corporate activities in a manner

detrimental to the Debtors.

179.    Such fiduciary duties included, among other things, a duty of good faith and fair

dealing, a duty of loyalty, a duty not to usurp corporate opportunities and a duty to avoid acts of

corporate waste.

180.    During the time of Debtors' insolvency, these fiduciary obligations also extended

to Debtors' creditors.

181.    Sutton, Fitzgerald, Klemmer, Anderson and Schreven breached their fiduciary

duties to the Debtors and/or their creditors by, *inter alia*, either willfully, recklessly and/or

negligently causing the Debtors to transfer fraudulently some or all of the Fraudulent Transfers.

182.    Sutton, Fitzgerald, Klemmer, Anderson and Schreven each were either: (a) aware

that the transfers were made to one or more of the Defendants identified in the General

Allegations for less than reasonably equivalent value and transferred with actual fraudulent intent, and thus his allowing the transfers to occur was an intentional breach of his fiduciary duties and was wanton and willful; or (b) reckless in that he recklessly violated his fiduciary duties by permitting the transfers to occur; or (c) negligent in that he negligently violated his fiduciary duties by permitting the transfers to occur.

183.    Sutton, Fitzgerald, Klemmer, Anderson and Schreven also breached their fiduciary duties to the Debtors and/or their creditors by, *inter alia*, either willfully, recklessly and/or negligently causing the Debtor(s) to make the Voluntary Payments and by perpetrating the Voluntary Payment Scheme, as alleged in the General Allegations.

184.    Sutton, Fitzgerald, Klemmer, Anderson and Schreven also breached their fiduciary duties to the Debtors and/or their creditors by either willfully, recklessly and/or negligently causing the Debtor(s) to enter into the insurance agreements and otherwise perpetrating the Reinsurance Scheme, as alleged in the General Allegations.

185.    Sutton, Fitzgerald, Klemmer, Anderson and Schreven also breached their fiduciary duties to the Debtors and/or their creditors by either willfully, recklessly and/or negligently perpetrating the Centrix Funds Formation Scheme, as alleged in the General Allegations.

186.    In so directing, authorizing, ratifying or otherwise approving said actions, Sutton, Fitzgerald, Klemmer, Anderson and Schreven each did not: (a) discharge his duties in good faith; (b) exercise the duty of care an ordinarily prudent person in a like position would exercise under similar circumstances; (c) avoid corporate waste; (d) avoid usurping corporate opportunities and/or (e) act in a manner he reasonably believed to be in the best interest of the Debtors.

187.    Sutton, Fitzgerald, Klemmer, Anderson and Schreven each were either:  (a) aware that each of his actions with respect to the Fraudulent Transfers, Voluntary Payments Scheme, the Reinsurance Scheme and the Centrix Funds Formation Scheme would harm the interests of the Debtors, and thus each Defendant's actions was an intentional breach of his fiduciary duties and wanton or willful; or (b) reckless in that he recklessly violated his duties through each of these actions; or (c) negligent in that he negligently violated his duties through each of these actions.

188.    As a direct and proximate result of Sutton, Fitzgerald, Klemmer, Anderson and Schreven's breaches of fiduciary duties, the Debtors and/or their creditors have been damaged in an amount subject to proof at trial, but not less than the amounts indicated in the General Allegations.

WHEREFORE, Plaintiff demands a judgment against Sutton, Fitzgerald, Klemmer, Anderson and Schreven, jointly and severally, for their breaches of each of their respective fiduciary duties in an amount of actual damages subject to proof at trial, but not less than the amount alleged herein, along with exemplary and punitive damages as to each Defendant herein for his intentional, wanton and willful misconduct, together with interest and costs, and for such other and further relief as the Court deems appropriate.

## COUNT IV:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

189.    Plaintiff realleges the preceding paragraphs as though stated fully herein.

190.    This Count IV for aiding and abetting breach of fiduciary duty is pled against all Defendants, other than Sutton, Fitzgerald, Klemmer, Anderson and Schreven.

191.    Sutton, Fitzgerald, Klemmer, Anderson and Schreven each owed fiduciary duties to the Debtors which each breached as described in the prior Count.  Such breaches were the direct and proximate cause of damage to Debtors.

192.    With respect to each of the transfers described as Fraudulent Transfers, the recipients of each such transfer knew that Sutton, Fitzgerald, Klemmer, Anderson and Schreven owed fiduciary duties that were being breached.   Yet each such Defendant voluntarily aided and abetted that breach.   This includes:

       (a)     Sutton's relatives who are Defendants as to at least the Sutton Family Amex Transfer and Sutton Family Salary Transfer;

       (b)     Birdie, as to the Birdie Transfer;

       (c)     Johnson Street as to the Johnson Street Holdings Transfer;

       (d)     6762 Potomac as to the Prepetition Loan Transfer; and

       (e)     Grand Construction, Harrison Custom Builders and Design Management, Inc. as to certain of the Fraudulent Transfers related to Sutton's residence.

193.    With respect to the Reinsurance Scheme, Defendants Consolidated, Williston, Lyndon and Founders knew that Sutton, Fitzgerald, Klemmer, Anderson and Schreven owed fiduciary duties that were being breached.   Yet each such Defendant voluntarily aided and abetted that breach.

194.    With respect to the Centrix Funds Formation Scheme, Defendants Johnson Street and Phoenix knew that Sutton, Fitzgerald, Klemmer, Anderson and Schreven owed fiduciary duties that were being breached, and voluntarily aided and abetted that breach.

195.    With respect to the Voluntary Payments, Defendants Williston, Lyndon and Founders knew that Sutton, Fitzgerald, Klemmer, Anderson and Schreven owed fiduciary duties that were being breached, and voluntarily aided and abetted that breach.

196.    With respect to the Fraudulent Transfers, Voluntary Payment Scheme, Reinsurance Scheme and Centrix Funds Formation Scheme, Defendants RES Capital and

Consolidated knew that Sutton, Fitzgerald, Klemmer, Anderson and Schreven owed fiduciary duties that were being breached.  Yet each such Defendant voluntarily aided and abetted that breach.

197.    The aiding and abetting of these breaches of fiduciary duty by each of the Defendants to this Count were a proximate cause of damage to Debtors.

198.    Each Defendant's actions described above were intentional, wanton and willful.

WHEREFORE, Plaintiff demands a judgment against each such Defendant for aiding and abetting breaches of his fiduciary duties in an amount of actual damages subject to proof at trial, but not less than the amount alleged herein, with such liability for each Defendant to be joint and several with each other Defendant who engaged in the particular wrongdoing at issue for the amount of damages resulting for such wrongdoing, as described above, along with exemplary and punitive damages as to each Defendant for his intentional, wanton and willful misconduct, together with interest and costs, and for such other and further relief as the Court deems appropriate.

## COUNT V:  AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 544 AND 550, AND COLO. REV. STAT. § 38-8-101 *ET SEQ.*

199.    Plaintiff realleges the preceding paragraphs as though stated fully herein.

200.    This Count V for Avoidance and Recovery of Fraudulent Transfers is pled against all of the Defendants.

201.    This is an action to avoid and recover fraudulent transfers pursuant to 11 U.S.C. §§ 544 and 550 and the Colorado Fraudulent Transfer Act, Colo. Rev. Stat. § 38-8-101 *et seq.*

202.    Within four (4) years prior to the Petition Date, the Debtors either:

A.    Transferred the sums alleged in the General Allegations as the Fraudulent Transfers or the Voluntary Payments to or for the benefit of each of the Defendants identified herein, either (1) with actual intent to hinder, delay or defraud certain creditors

of the Debtor or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, while: (a) the Debtors were engaged or about to engage in a business or transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or the transaction; or (b) the Debtors intended to incur, or believed and reasonably should have believed that the Debtors would incur, debts beyond the Debtors' ability to pay as they became due, each in violation of Colo. Rev. Stat. § 38-8-105 and other provisions of the Colorado Fraudulent Transfer Act, or

B.      Transferred the sums alleged in the General Allegations as the Fraudulent Transfers or the Voluntary Payments to or for the benefit of each of the Defendants as alleged herein, without receiving a reasonably equivalent value in exchange for the transfer or obligation, while the Debtors were insolvent or became insolvent as a result of the transfer or obligation, each in violation of Colo. Rev. Stat. § 38-8-106(1) and other provisions of the Colorado Fraudulent Transfer Act, or

C.      Transferred the sums alleged in the General Allegations as the Fraudulent Transfers or the Voluntary Payments to or for the benefit of each of the Defendants as alleged herein, who were insiders of the Debtors, for an antecedent debt, the Debtors were insolvent at the time the transfers were made and such insider Defendant(s) had reasonable cause to believe that the Debtors were insolvent, each in violation of Colo. Rev. Stat. § 38-8-106(2) and other provisions of the Colorado Fraudulent Transfer Act.

203.    Pursuant to § 544 of the Bankruptcy Code, 11 U.S.C. § 544, the Debtors are entitled to avoid the transfers identified in the General Allegations as the Fraudulent Transfers and the Voluntary Payments which were made to or for the benefit of each such Defendant as alleged in the General Allegations.

204.    Each Defendant identified in the General Allegations was the transferee of the transfers pursuant to 11 U.S.C. § 550(a).  Pursuant to 11 U.S.C. §§ 550(a)(1) and (a)(2), the Debtors may recover the transfers from the Defendants.

205.    Some or all of the Defendants identified in the General Allegations were either: (a) individuals or entities for whose benefit such transfers were made; or (b) the immediate or mediate transferees of the initial transferees.  Accordingly, Plaintiff seeks avoidance of the transfers from those Defendants herein to the fullest extent permitted by law, and in accordance with 11 U.S.C. § 550(a)(2).

WHEREFORE, Plaintiff demands a judgment against each Defendant determining that the transfers alleged herein as the Fraudulent Transfers and the Voluntary Payments paid by the Debtors to or for the benefit of each of the Defendants identified in the General Allegations within four years prior to the Petition Date are fraudulent transfers under Colo. Rev. Stat. § 38-8-101 *et seq*. and § 544 of the Bankruptcy Code, avoiding the transfers under § 550 of the Bankruptcy Code in an amount subject to proof at trial, but not less than the amounts set forth herein and awarding the Plaintiff interest and costs, and such other and further relief as the Court deems appropriate.

## COUNT VI:  AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(A)(1)(A) AND 550

206.    Plaintiff realleges the preceding paragraphs as though fully stated herein.

207.    This Count VI for Avoidance and Recovery of Fraudulent Transfers is pled against all of the Defendants except Klemmer, Anderson and Schreven.

208.    This is an action to avoid and recover fraudulent transfers pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550.

209.    The transfers that are the subject of this Count VI are those Fraudulent Transfers and certain of the Voluntary Payments that were made on or within two years prior to the Petition Date.

210.    The transfers that are the subject of this Count VI were made with the actual intent to hinder, delay, or defraud any entity to which the Debtor(s) was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

211.    Accordingly, the transfers are fraudulent transfers under § 548 of the Bankruptcy Code and are recoverable by the Debtors under § 550 of the Bankruptcy Code.  11 U.S.C. §§ 548, 550.

212.     Some or all of the Defendants herein were either: (a) individuals or entities for whose benefit such transfers were made; or (b) the immediate or mediate transferees of the initial transferees.  Accordingly, Plaintiff seeks avoidance of the transfers from those Defendants herein to the fullest extent permitted by law, and in accordance with 11 U.S.C. § 550(a)(2).

WHEREFORE, Plaintiff demands a judgment determining that the transfers alleged herein to each such Defendant within one year prior to the Petition Date are fraudulent transfers under § 548(a)(1)(A) of the Bankruptcy Code, avoiding the transfers under § 550 of the Bankruptcy Code in an amount subject to proof at trial, but not less than the amounts set forth herein, awarding the Plaintiff interest and costs, and such other and further relief as the Court deems appropriate.

## COUNT VII:  AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 548(A)(1)(B) AND 550

213.     Plaintiffs reallege the preceding paragraphs as though fully stated herein.

214.     This Count VII for Avoidance and Recovery of Fraudulent Transfers is pled against all of the Defendants except Klemmer, Anderson and Schreven.

215.     This is an action to avoid and recover fraudulent transfers pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550.

216.     The transfers that are the subject of this Count VII are those Fraudulent Transfers and certain of the Voluntary Payments that were made on or within two years prior to the Petition Date.

217.     The Debtors received less than a reasonably equivalent value in exchange for the transfers that are the subject of this Count VII; and the Debtor(s)

(a)     were insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; or

(b)     were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtor(s) was an unreasonably small capital; or

(c)     intended to incur, or believed that the Debtor(s) would incur, debts that would be beyond the Debtor's (s') ability to pay as such debts matured; or

(d)     made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

218.    Accordingly, the transfers that are the subject of this claim are fraudulent transfers under § 548 of the Bankruptcy Code and are recoverable by Plaintiff under § 550 of the Bankruptcy Code.

219.    Some or all of the Defendants herein were either: (a) individuals or entities for whose benefit such transfers were made; or (b) the immediate or mediate transferees of the initial transferees.  Accordingly, Plaintiff seeks avoidance of the transfers from those Defendants herein to the fullest extent permitted by law, and in accordance with 11 U.S.C. § 550(a)(2).

WHEREFORE, Plaintiff demands a judgment determining that the transfers that are the subject of this claim are fraudulent transfers under § 548(a)(1)(b) of the Bankruptcy Code, avoiding the transfers under § 550 of the Bankruptcy Code in an amount subject to proof at trial, but not less than the amounts set forth herein, awarding the Debtors interest and costs, and such other and further relief as the Court deems appropriate.

## COUNT VIII:  RECHARACTERIZATION OF DEBT AS EQUITY OR, ALTERNATIVELY, TO SUBORDINATE DEBT

220.    Plaintiff realleges the preceding paragraphs as though fully stated herein.

221.     This Count VIII for Recharacterization of Debt as Equity or, Alternatively, to Subordinate Debt, is pled against all Defendants.

222.     Each of the Defendants claims or may claim an alleged debt owing by the Debtors.

223.     Due to each of the Defendants' status as an insider, each Defendant should have contributed to the Debtors the property or services giving rise to the alleged debts in the form of equity contributions.

224.     Accordingly, to the extent that any Defendant alleges a debt owing by the Debtors, such debt, under the circumstances of this case, should be recharacterized as equity contributions pursuant to 11 U.S.C. § 105(a).

225.     Alternatively, based on the conduct of each Defendant as set forth above, any debt allegedly owing by the Debtors to each Defendant should be subordinated to the claims of Unsecured Creditors as provided in 11 U.S.C. § 510(c).

WHEREFORE, Plaintiff demands a judgment recharacterizing as equity contributions any debt alleged to be owing to any Defendant herein pursuant to 11 U.S.C. § 105(a), or alternatively, subordinating any debt allegedly owing by Debtors to any Defendant herein to the claims of the unsecured creditors, pursuant to 11 U.S.C. § 510(c), together with any such other and further relief as the Court deems appropriate.

## COUNT IX:  AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. §§ 547(B) AND 550(A)(1)

226.     Plaintiff realleges the preceding paragraphs as though fully stated herein.

227.     This Count IX for Avoidance and Recovery of Preferential Transfers is pled against all Defendants who received a transfer from the Debtors on or within 90 days of the

Petition Date, or within one year of the Petition Date for insiders, for the amounts alleged in the General Allegations.

228.    Such transfers are avoidable pursuant to § 547(b) of the Bankruptcy Code because each such transfer:

(a)    was a transfer of an interest of a Debtor in property;

(b)    was to or for the benefit of a creditor;

(c)    was for or on account of an antecedent debt owed by such Debtor before such transfer was made;

(d)    was made while such Debtor was insolvent;

(e)    was made on or between ninety days and one year before the Petition Date to an insider; and

(f)    enabled each Defendant that is the subject of this Count to receive more than it would have received if these cases had been filed as chapter 7 cases, had the subject transfers not been made, and had the identified Defendant received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

229.    Each Defendant identified in the preceding paragraph was the initial transferee of each such transfer pursuant to 11 U.S.C. § 550(a)(1).

230.    Some or all of the Defendants herein were either: (a) individuals or entities for whose benefit such transfers were made; or (b) the immediate or mediate transferees of the initial transferees.  Accordingly, Plaintiff seeks avoidance of the transfers from those Defendants herein to the fullest extent permitted by law, and in accordance with 11 U.S.C. § 550(a)(2).

WHEREFORE, Plaintiff demands a judgment determining that the transfers to each Defendant identified in this Count are preferential transfers under § 547(B) of the Bankruptcy

Code, avoiding the transfers under § 550 of the Bankruptcy Code in an amount subject to proof at trial, but not less than the amounts set forth herein, awarding the Debtors interest and costs, and such other and further relief as the Court deems appropriate.

### COUNT X:  DISALLOWANCE OF CLAIMS UNDER 11 U.S.C. § 502(D)

231.    Plaintiff realleges the preceding paragraphs as though fully stated herein.

232.    This Count X is pled against all Defendants who have filed or will file claims against the Debtors.

233.    Pursuant to § 502(d) of the Bankruptcy Code, the claims of each Defendant should be disallowed unless and until each such Defendant has turned over to the Debtors the property transferred, or paid to the Debtors the value of such property, for which the Defendants are liable under § 550 of the Bankruptcy Code.

WHEREFORE, by reason of the allegations stated herein and pursuant to § 502(d) of the Bankruptcy Code, the claims of each Defendant should be disallowed unless and until each such Defendant has turned over to Plaintiff the property transferred, or paid to Plaintiff the value of such property, for which the Defendants are liable under § 550 of the Bankruptcy Code.

### COUNT XI:  CONVERSION

234.    Plaintiff realleges the preceding paragraphs as though fully stated herein.

235.    This Count XI is pleaded against all Defendants for conversion.

236.    The wrongdoing attributable to each Defendant as described above, including but not limited to each Defendant's role in the Fraudulent Transfers Reinsurance Scheme, Voluntary Payment Scheme and/or Centrix Funds Formation Scheme, wrongfully deprived Debtors of property that Debtors were entitled to possess.

237.    Defendants' misconduct was the direct and proximate cause of damage to Debtors in a total amount of more than approximately $100 million.

238.    Each Defendant engaged in conduct constituting conversion that was intentionally wrong, willful and wanton.

WHEREFORE, Plaintiff demands a judgment against each Defendant finding such Defendants liable for conversion and awarding Plaintiff its actual damages in an amount subject to proof after trial, but not less than the amount alleged herein, with such liability to be joint and several with the other Defendants who engaged in the particular wrongdoing at issue for the amount of damage resulting from such wrongdoing, along with exemplary and punitive damages for each Defendant's willful and wanton conduct, together with interest, and costs and such further and other relief as this Court deems appropriate.

## COUNT XII:  CIVIL CONSPIRACY

239.    Plaintiff realleges the preceding paragraphs as though fully stated herein.

240.    This Count XII is pleaded against all Defendants.

241.    Each Defendant is liable for civil conspiracy, as set forth herein.

242.    Sutton devised and perpetrated several schemes to enrich himself, his family, his other business and/or his friends at Debtors' expense.

243.    Sutton's schemes included misusing his control of the Debtors and taking advantage of the complicated relationships among the various Debtors to mastermind the transfers challenged herein.  These injured Debtors and served no legitimate purpose and were solely done to enrich and benefit Sutton, and/or his family, his other businesses and/or his cronies at Debtors' expense.

244.    Each of the other Defendants knew that he or she was benefiting from transfers for which he or she provided no legitimate consideration or value to Debtors.

245.    Each Defendant agreed to assist, aid, abet and otherwise participate in the Fraudulent Transfers described in the General Allegations above.

246.     Each of the Fraudulent Transfers reflects an unlawful overt act by the beneficiary and/or recipient of that transfer.

247.     The Voluntary Payment Scheme, Reinsurance Scheme and Centrix Funds Formation Scheme described above each also represent overt acts perpetrated by Sutton and various Defendants to enrich himself, his family, his other businesses and/or his cronies at Debtors' expense.

248.     In addition to the Defendants, Sutton was assisted by other unnamed co-conspirators in these efforts, including non-debtor businesses he controlled and the John Does 1-50 named herein.

249.     Debtors were damaged as a direct and proximate result by Defendants' civil conspiracy in an amount greater than approximately $100 million.

250.     In perpetrating the civil conspiracy each Defendant intentionally engaged in misconduct that was wanton and willful.

WHEREFORE, Plaintiff demands judgment in its favor and against each Defendant for civil conspiracy in an amount of actual damages subject to proof at trial, but not less than the amount alleged herein, with such liability to be joint and several with the other Defendants who engaged in the particular wrongdoing at issue for the amount of damage resulting from such wrongdoing, along with exemplary and punitive damages for Defendants' wanton and willful conduct, together with interest and costs, and such other and further relief as this Court deems appropriate.

## COUNT XIII:  COMMON LAW FRAUD

251.     Plaintiff realleges the preceding paragraphs as though fully stated herein.

252.     This Count XIII is pleaded against Sutton.

253.     Sutton is liable for common law fraud as set forth herein.

254.    With regard to the Fraudulent Transfers described above that occurred while Debtors were insolvent, Sutton attempted to hide or disguise that these transfers served no legitimate business purpose for Debtors but rather were intended to enrich Sutton, his family, or his other businesses at Debtors' expense.  This included the use of sham or shell companies and entities that were designed to disguise the actual purpose of the transactions and that Sutton or related insiders received the actual benefit of these transfers.

255.    The Reinsurance Scheme also allowed Sutton to act for his own benefit at Debtors' expense.  Sutton failed to disclose the true nature of this scheme despite having a duty to do so.

256.    Sutton caused Debtors to engage in the Voluntary Payment Scheme to lull and silence others who otherwise might have revealed Sutton's misconduct and misuse of Debtors.

257.    Sutton also failed to disclose to Debtors' creditors despite having a duty to do so that he was causing Debtors to act for his sole benefit and to their detriment with no legitimate purpose at a time that Debtors were insolvent.

258.    Sutton's omissions and acts of fraudulent concealment lulled the creditors into failing to take steps to protect their interest in Debtors when, had proper disclosure been made, they would have known Sutton was acting to Debtors' detriment and could have acted to protect the Debtors and their interests.

259.    The creditors therefore forewent opportunities they might otherwise have had to prevent losses to the Debtors that Sutton otherwise caused Debtors to incur.

260.    As a direct and proximate result of Sutton's acts of fraud, Debtors have been injured in an amount greater than approximately $100 million.

261.    In perpetrating his fraud, Sutton engaged in willful and wanton misconduct.

WHEREFORE, Plaintiff demands judgment in its favor and against Sutton for fraud in an amount of actual damages subject to proof at trial, but not less than the amount alleged herein, along with exemplary and punitive damages for Sutton's wanton and willful conduct, together with interest and costs, and such other and further relief as this Court deems appropriate.

### COUNT XIV:  CIVIL THEFT PURSUANT TO COLO. REV. STAT. § 18-4-401 *ET SEQ.*

262.    Plaintiff realleges the preceding paragraphs as though stated fully herein

263.    This Count XIV for civil theft is pled against Defendant Sutton.

264.    This is an action for civil theft pursuant to Colo. Rev. Stat. § 18-4-401 *et seq.*

265.    Through the wrongdoing described above, Sutton, in violation of Colo. Rev. Stat. § 18-4-401, knowingly obtained and exercised control over Debtors' valuable assets, without authorization and/or by threat or deception and:

(1)    knowingly used, concealed or abandoned such valuable assets in such a manner as to deprive Debtors permanently of their benefit;

(2)    used, concealed and/or abandoned such valuable assets intending that such use would deprive Debtors permanently of their use or benefit; or

(3)    demanded consideration to which he was not lawfully entitled as a condition for restoring such valuable assets of value to Debtors.

266.    Debtors were injured as a direct and proximate result by Sutton's acts of actual theft in an amount well in excess of $100 million.

267.    Pursuant to Colo. Rev. Stat. § 18-4-405, Debtors are entitled to treble the amount of their actual damages from Sutton, along with costs and attorney's fees as relief for Sutton's acts of civil theft.

WHEREFORE, Plaintiff demands judgment in its favor and against Sutton for civil theft in an amount subject to proof at trial, but not less than the amount alleged herein, such amounts

to be trebled pursuant to Colo. Rev. Stat. § 18-4-405, along with Plaintiff's attorney's fees, pursuant to that subsection, together with interest and costs and such other relief as this Court deems appropriate.

### **COUNT XV:  ALTER EGO**

268.     Plaintiff realleges the preceding paragraphs as though fully stated herein.

269.     This Count XV is pleaded against Sutton.

270.     Sutton is liable for *alter ego* liability for his disregard of the corporate form of Debtor Centrix Financial and his treatment of it as his personal fiefdom and a mere instrumentality for his sole benefit.

271.     Sutton's officership and ownership interests in Debtor Centrix Financial gave him complete domination of its finances, policy and business practices with regard to the transactions described in the General Allegations.

272.     Sutton misused this domination to wrongfully enrich himself at Debtors' expense, including, but not limited, by using Debtors to pay the amounts alleged herein as Fraudulent Transfers, including:  (a) approximately $14.7 million for his personal taxes; (b) $100,000 for his personal jet; (c) more than $2.4 million for his home repairs and mortgage; (d) sporting event costs, including more than $91,000 spent at NASCAR; (e) personal items from Tiffany's; (f) personal anniversary gifts; (g) more than $400,000 in personal and family credit card repayments; and (h) personal distributions to himself of more than $1 million and to family members of more than $300,000 for no consideration, as described above.

273.     Sutton also diverted for the benefit of himself or his entities more than $26.7 million of loan proceeds while keeping Debtors on the hook for repayment and their collateral at risk for this.

274.    Sutton caused $74,650 to be paid to Walt Disney On-line which brought Debtors no benefit from the Magic Kingdom but instead helped pave their way into bankruptcy.

275.    Sutton also misused his domination to cause Debtor Centrix Financial to assume the real risks of loss in the Reinsurance Scheme, while he received placement fees and personally benefited for premiums and other payments made to Founders.

276.    Sutton also disregarded the corporate form of Debtor Centrix Financial by causing it to make the Voluntary Payments, which helped to ensure the continuation of transactions and relationships that benefited Sutton at Debtor Centrix Financial's expense.

277.    Sutton further disregarded the corporate form of Debtor Centrix Financial by masterminding the Centrix Funds Formation Scheme, including the ultimate transfer to Johnson Street, an entity he controls.

278.    Debtors were injured as a direct and proximate result of Sutton's disregard of their corporate form.

279.    To adhere to the doctrine of corporate entity here would promote injury and protect fraud.

280.    In treating Debtors, including Debtor Centrix Financial, as his *alter ego* Sutton acted wantonly and willfully.

WHEREFORE, Plaintiff demands that the veil of the Debtors, including Debtor Centrix Financial be pierced such that Sutton is held personally liable for his misuse of these corporations as his *alter* ego as described above, with Sutton ordered to pay resultant damages in an amount subject to proof at trial, but not less than the amount alleged herein, along with exemplary and punitive damages for Sutton's wanton and willful conduct, together with interest and costs, and such other and further relief as this Court deems appropriate.

Dated:  September 3, 2008

Respectfully submitted,

By /s/ Douglas W. Jessop
JESSOP & COMPANY, P.C.
Douglas W. Jessop (13299)
Megan M. Adeyemo (36721)
303 East 17th Avenue, Suite 930
Denver, CO  80203
Telephone:  (303) 860-7700
Facsimile:  (303) 860-7233
Email:        dwjessop@jessopco.com
                  mmadeyemo@jessop.com


FOLEY & LARDNER LLP
Michael P. Richman
90 Park Avenue
New York, New York 10016
Telephone:  (212) 338-3409
Facsimile:  (212) 687-2329
Email:        mrichman@foley.com

Ann Marie Uetz
500 Woodward Avenue, Suite 2700
Detroit, Michigan  48226
Telephone:  (313) 234-7114
Facsimile:  (313) 234-2800
Email:        auetz@foley.com

David B. Goroff (admission pending)
321 N. Clark Street, Suite 2800
Chicago, Illinois  60654-5313
Telephone:  (312) 832-4500
Facsimile:  (312) 832-4700
Email:        dgoroff@foley.com

*Counsel to the Plaintiff Trust
and to the Plaintiff Trustee*